## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DIXIE ELECTRIC, LLC., <u>et al.</u>,[1] | Case No. 18-12477 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF JERRIT COWARD, CHIEF EXECUTIVE OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jerrit Coward, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Dixie Electric, LLC ("Dixie"), a corporation organized under the laws of the State of Texas and one of the above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company").  I have served in this role since January 31, 2018, and I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      Prior to joining the Company, I was one of the founders of US Shale Solutions. I previously served as Executive Vice President, Business/Corporate Development at Willbros Group ("Willbros") and President of Willbros's $1.1 Billion Oil & Gas segment. Prior to that, I was President of its Upstream segment. I joined Willbros in 2002 as a Project Manager, and assumed full responsibility for Willbros's Nigerian operations in 2005 and oversaw the discontinuation and sale of Willbros's Nigerian interests. Prior to joining Willbros, I worked for

---

[1]      The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: FR Dixie Holdings Corp. (4205), FR Dixie Acquisition Corp. (6859), FR Dixie Acquisition Sub Corp. (6379), Dixie Electric, LLC (3176), Monahans Electric, Inc. (2307), K&S Electric, Inc. (8960), L&K Electric, LLC (3297), Patriot Automation & Control, LLC (7466), Epic Integrated Services, LLC (5274), Action Electric Holdings, Inc. (4496), Action Electric, Inc. (0227), Mac Supply, Inc. Electrical Contractors (6230), and Wellkeeper, Inc. (4522).  The mailing address for each Debtor is 1155 Dairy Ashford Rd, Suite 450, Houston, TX 77079.

Global Industries in the capacities of Project Manager, Operations Manager and Commercial Manager. I have served on the board of directors of Junior Achievement of Southeast Texas, Inc. and the Board of International Pipe Line and Offshore Contractors Association (IPLOCA). I hold a B.S. in engineering from Texas A&M at Galveston.

3.     I submit this declaration to provide an overview of the Company, its businesses, and the Chapter 11 Cases (as defined below), as well as to support the Debtors' chapter 11 petitions and the First Day Motions (as defined below).  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and the Company's advisors, or my opinion based on my experience concerning the Company's operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     As described more fully herein, the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") with a Restructuring Support Agreement (the "RSA") signed by (a) the Debtors, (b) holders of over 67% in outstanding principal amount of claims (such holders, the "Consenting Prepetition Secured Lenders" and such claims, the "Secured Loan Claims") under the Prepetition Secured Credit Agreement (as defined below), (c) Wilmington Trust, National Association, as successor administrative agent under the Prepetition Secured Credit Agreement (the "Prepetition Agent"), (d) the lender under the Company's unsecured loan agreement (the "Prepetition Unsecured Lender" and the claims arising under such unsecured loan agreement, the "Unsecured Loan Claims"), (e) the sole holder (the "Consenting Equityholder") of the equity interests in FR Dixie Holdings Corp., a Delaware corporation (the "Parent"), and (f) the

Consenting Prepetition Secured Lenders, in their capacities as committed lenders under the DIP

Facility (as defined below) and an exit facility (the "DIP Lenders").

5.      The RSA serves as the cornerstone of the Plan[2] and establishes the framework for

the Company's restructuring by: (i) recapitalizing the Debtors' balance sheet through a debt-to-

equity conversion of all of the Debtor's prepetition funded indebtedness on a consensual basis

through the Plan; (ii) providing a timeline and process for the implementation of the restructuring

transactions for the Debtors (the "Restructuring Transactions"), subject to the terms and

conditions set forth therein; (iii) providing for a new debtor-in-possession facility (the "DIP

Facility") funded by the DIP Lenders to provide the Debtors with sufficient liquidity during the

pendency of the Chapter 11 Cases; (iv) providing for a new credit facility to be available upon

emergence from the Chapter 11 Cases funded from the conversion of the DIP Facility and new

money loans funded by the DIP Lenders; (v) preserving and maintaining the ongoing business

operations of the Company with limited interruption during the pendency of the Chapter 11

Cases; and (vi) implementing a comprehensive settlement and resolution of claims held by or

against the Debtors with certain of its stakeholders, including the Prepetition Secured Lenders,

the Prepetition Agent, the Prepetition Unsecured Lender and the Consenting Equityholder.  In

particular, implementation of the Restructuring Transactions contemplated by the Plan will

enable the Debtors to de-lever their prepetition balance sheet by extinguishing approximately

$300 million of indebtedness from the conversion of all of the Secured Loan Claims and the

Unsecured Loan Claims into post-reorganization equity and to position their businesses for

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the *Joint Pre-Packaged Plan of Reorganization of Dixie Electric, LLC and Its Debtor Affiliates* (as may be
amended, modified or supplemented from time to time, the "Plan"), filed contemporaneously herewith or,
if not defined in the Plan, in the *Disclosure Statement for Joint Pre-Packaged Plan of Reorganization of
Dixie Electric, LLC and its Debtor Affiliates* (as may be amended, modified or supplemented from time to
time, the "Disclosure Statement").

stability and success after emergence from bankruptcy.  In light of this, the Debtors believe that the Plan is in the best interests of their estates and should be confirmed.

6.    Moreover, following execution of the RSA, the Restructuring Transactions contemplated by the Plan carry the overwhelming support of each class of impaired creditors and ensure committed debtor-in-possession and exit financing.  Pursuant to the RSA, the Consenting Prepetition Secured Lenders (who hold over 67% of the Secured Loan Claims) and the Prepetition Unsecured Lender (holders of Secured Loan Claims and holders of Unsecured Loan Claims, collectively, the "Voting Parties") have agreed, subject to the terms and conditions of the RSA and the Plan, to vote in favor of the Plan.  Further, the DIP Lenders have agreed to facilitate the Debtors' emergence from chapter 11 by agreeing to provide financing under an exit facility of up to $30 million of term loans.  Subject to approval of the Court and other conditions to the exit facility, the committed financing enables the Debtors to land softly into chapter 11 and emerge from bankruptcy with a healthy balance sheet.

7.    As further described in the *Declaration of Peter Laurinaitis in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b)*, filed contemporaneously herewith (the "Laurinaitis Declaration"), given the circumstances, the DIP Facility is the best financing option available and is part of a larger agreement of the Consenting Prepetition Secured Lenders to support the Restructuring Transactions, to provide the DIP Facility and the exit financing and to convert all of their

Secured Loan Claims into equity, and the terms of the DIP Facility are fair, reasonable and appropriate.

8.        To effectuate the Restructuring Transactions and in accordance with the RSA, the Debtors have commenced the Chapter 11 Cases on the date hereof (the "Petition Date").  To minimize the adverse effects of filing for chapter 11 on their businesses, the Debtors have filed contemporaneously herewith a number of motions seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations that are necessary to fulfill their duties as debtors in possession and to continue to operate their businesses in the ordinary course and without interruption.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimum disruption, loss of productivity, or value, and that each First Day Motion constitutes a critical element in achieving a successful and expeditious pre-packaged reorganization of the Debtors' businesses and best serves the interests of the Debtors' estates, their creditors, and all parties in interest.

9.        To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of the Chapter 11 Cases, this declaration is divided into four sections.  Section I provides an overview of the Company's businesses.  Section II discusses the Company's organizational and capital structure.  Section III describes the events leading to the filing of the Chapter 11 Cases and explains the Company's restructuring efforts before, and objectives during, the Chapter 11 Cases.  Section IV summarizes the relief requested in, and the facts supporting, each of the First Day Motions.

## I.    COMPANY OVERVIEW

10.    The Company, dba Expanse Energy Solutions, is a privately held provider of electrical infrastructure materials and services to the energy industry.

11.    The Company's corporate headquarters are located at 1155 Dairy Ashford Road, Suite 450 Houston, Texas 77079.

12.    The Company was founded and began operations in 1951. In 2011, One Rock Capital Partners, LLC ("One Rock") acquired the Company. In 2013, First Reserve Management, L.P. (together with certain of its affiliates, "First Reserve" or the "Sponsor") acquired the Company from One Rock.

13.    The Company offers its upstream and midstream customers solutions for oilfield electrical infrastructure and automation for the initial development of an oilfield through its full lifecycle. These services include ongoing infrastructure upgrades and periodic maintenance, including the initial design, installation, subsequent modification, upgrade and maintenance of the electrification and automation infrastructure.  The Company's operations are concentrated in the Permian and Bakken basins, each in North America, where the Company believes that it is the market leader. The Company operates three business lines: (1) Electrical Pole Line; (2) Electrification; and (3) Automation.  The Company operates pursuant to long-established Master Service Agreements with its customers, which promote relationships characterized by a consistent flow of repeat orders from its customers.

14.    The Company has 16 branches in Montana, New Mexico, North Dakota, Oklahoma and Texas that provide its services to customers in the Permian and Bakken basins. The Permian Basin, situated in the Western portion of Texas and in Southeast New Mexico, is one of the largest structured oil and gas basins in the United States, extending in excess of 78,000 square miles. The Bakken Basin spans approximately 200,000 square miles with its

deepest point near Watford City, North Dakota. The Company operates its electrification and automation business lines in each basin, but does not operate its electric pole business in the Bakken region.

15.     The Debtors' primary vendors consist of electrical suppliers. The Debtors' top three customers are oil and gas producers, who collectively accounted for approximately 20% of the Debtors' revenue for the year ended December 31, 2017 and 24% for the nine months ended September 30, 2018. The Company has a diverse and large customer base within the oil and gas industry, servicing approximately 150 customers per month.

16.     In its Electric Pole Line business lines, the Company provides installation, maintenance and upgrade services related to electric pole lines. The Company's customers require initial connections to their well sites, salt water disposal wells and pipelines to the nearest existing electrical grid. The Company then maintains and upgrades these pole line connections for the customer's pole line infrastructure. The Company's Electric Pole Line business line accounted for approximately 15% of its revenues for the year ended December 31, 2017.

17.     In its Electrification business line, the Company provides installation, maintenance and upgrade services of electrical systems used to operate oilfield infrastructure such as motors, conductors and transformers, which includes all customer facilities and wellsites. The Company's Electrification business line accounted for approximately 70% of its revenues for the year ended December 31, 2017.

18.     In its Automation business line, the Company provides design, implementation, maintenance, programming and upgrade services of automation and telemetry devices permitting automatic operation, remote process control and automated well site monitoring. This includes installing various sensors at sites to monitor the status of critical components of an oil services

operation including oil tanks. The Company's Automation business line accounted for approximately 15% of its revenues for the year ended December 31, 2017.

19.     For the year ended December 31, 2017, the audited and consolidated financial statements of the Company reflected revenue of $125.7 million and a net loss of $52.1 million. For the nine months ended September 30, 2018, the unaudited and consolidated financial statements of the Company reflected revenue of $95.0 million and a net loss of $24.5 million. As of September 30, 2018, the Company's unaudited and consolidated balance sheet reflected assets totaling $145.3 million and liabilities totaling $316.4 million.

20.     The Company has approximately $145.3 million in total assets as of the end of the third quarter of 2018. The Company currently holds at least $4.4 million in unencumbered, unrestricted cash. The Company's assets are concentrated in the Permian and Bakken basins.

21.     As of the Petition Date, the Company had approximately 580 full-time employees, consisting of electricians, electrical linemen, automation technicians, foremen, mechanics, operators, managers, supervisors, and other personnel.  The employees are located at the Debtors' offices and at various field locations in Montana, New Mexico, North Dakota, Oklahoma, South Dakota, and Texas. The Debtors also supplement their workforce by employing a *de minimis* number of temporary workers, whose services are procured indirectly through third-party staffing agencies, and independent contractors.  None of the Company's employees is covered by collective bargaining agreements or represented by an employee union.

## II.     CAPITAL AND ORGANIZATIONAL STRUCTURE

### A.     ORGANIZATIONAL STRUCTURE

22.     A corporate structure chart is attached as Exhibit A and provides an illustrative representation of the current corporate and organizational structure of the Debtors and certain operating affiliates.

01:23810129.2

8

B.      **THE DEBTORS' PREPETITION CAPITAL STRUCTURE**

23.      The current capital structure of the Debtors as of the date of this declaration includes the following:

(a)      Indebtedness in an aggregate principal amount of approximately $287.0[3] million of secured loans outstanding under the Prepetition Secured Credit Agreement comprised of revolving loans in an aggregate principal amount of approximately $19.6 million and term loans in an aggregate principal amount of approximately $267.4 million;

(b)      Indebtedness in an aggregate principal amount of approximately $8.0 million in principal amount of unsecured loans outstanding under the Prepetition Unsecured Loan Agreement; and

(c)      The Existing Parent Interests held by the Consenting Equityholder.

1.      **PREPETITION INDEBTEDNESS UNDER THE SECURED CREDIT AGREEMENT**

24.      On December 18, 2013, FR Dixie Acquisition Corp. (the "Borrower"), Parent and the other parties thereto entered into a secured credit agreement (the "Prepetition Secured Credit Agreement"), which provided for initial commitments of $280 million in term loans and $40 million in revolving loans, $40 million of which could be used for the issuance of letters of credit. The Prepetition Secured Credit Agreement was amended and restated on January 29, 2014 and further amended by that certain Amendment No. 1 to Credit Agreement, dated as of August 11, 2017, which among other things reduced the revolving credit facility to an aggregate principal amount of $24,000,000 of which $24,000,000 could be used for the issuance of letters of credit, and that certain Resignation and Appointment Agreement and Amendment No. 2 to Credit Agreement (the "Resignation Amendment"), dated as of August 31, 2018. Pursuant to the

---

[3]      This amount excludes issued and outstanding letters of credit as of the date hereof under the Prepetition Secured Credit Agreement with a face amount of approximately $4.3 million.  In the event an outstanding letter of credit under the Prepetition Secured Credit Agreement is drawn on, obligations arising from such draw would become revolving loans outstanding under the Prepetition Secured Credit Agreement, constitute Secured Loan Claims under the Plan and share ratably in the treatment of Class 1 Secured Loan Claims.

Resignation Amendment, UBS AG, Stamford Branch ("UBS"), resigned as administrative agent under the Prepetition Secured Credit Agreement and Wilmington Trust, National Association, replaced UBS as the successor administrative agent.

25.    As of the Petition Date, the Debtors have approximately $287.0 million[4] of aggregate principal amount of indebtedness outstanding under the Prepetition Secured Credit Agreement, consisting of revolving loans, in an aggregate principal amount of $19.6 million and term loans in an aggregate principal amount of $267.4 million.  Obligations under the Prepetition Secured Credit Agreement are guaranteed by the Debtors, with the exception of Wellkeeper, Inc. and MAC Supply, Inc. Electrical Contractors (the "Existing Credit Parties"), and are secured by a first priority lien on substantially all of the assets of the Existing Credit Parties, subject to certain exceptions.  The revolving loans and the term loans are secured on a pari passu basis. The term loans have a scheduled maturity date of December 18, 2020 and the revolving loans have a scheduled maturity date of December 18, 2018.

### 2.    UNSECURED LOAN FACILITY

26.    On October 13, 2017, Borrower entered into the Prepetition Unsecured Loan Agreement with the Prepetition Unsecured Lender. Pursuant to the Prepetition Unsecured Loan Agreement, the Prepetition Unsecured Lender agreed to extend unsecured term loans to the Borrower in an aggregate principal amount of up to $10.0 million.  As of the Petition Date, there was an aggregate principal amount of $8.0 million outstanding under the Prepetition Unsecured Loan Agreement. Due to the nature and timing of the Prepetition Unsecured Loan Agreement as

---

[4]    As noted above, this amount excludes issued and outstanding letters of credit as of the date hereof under the Prepetition Secured Credit Agreement with a face amount of approximately $4.3 million.  In the event an outstanding letter of credit under the Prepetition Secured Credit Agreement is drawn on, obligations arising from such draw would become revolving loans outstanding under the Prepetition Secured Credit Agreement, constitute Secured Loan Claims under the Plan and share ratably in the treatment of Class 1 Secured Loan Claims.

further described below, among other things, the Prepetition Unsecured Loan Agreement did not provide for a maturity date of the loans (but that repayment may be made upon written request of the Prepetition Unsecured Lender), contain any financial covenants or require any guarantees from any other Company entities.

### 3.    EQUITY OWNERSHIP

27.    The Company is a private company, ultimately beneficially held by the Sponsor. Parent's authorized capital structure consists of one class of interests: the existing parent interests (the "Existing Parent Interests"). As of the Petition Date, 2018, 1,000 shares of Existing Parent Interests were outstanding.

### C.    CERTAIN OF THE DEBTORS' OTHER PREPETITION ASSETS AND LIABILITIES

### 1.    THE 2018 SALE-LEASEBACK TRANSACTION

28.    On February 28, 2018, Dixie Electric, LLC and Monahans Electric, Inc. (collectively, the "SLB Lessees"), entered in a sale-leaseback transaction with FR Dixie RE, LLC (the "SLB Lessor"), an affiliate of the Sponsor, pursuant to a purchase and sale agreement (the "SLB PSA"). Pursuant to the SLB PSA, the SLB Lessees sold eight properties to the SLB Lessor for approximately $12.8 million, who then leased the properties back to the Lessees. The Parties entered into eight related Fully Net Building Leases (the "SLB Leases") in connection with the SLB PSA. The aggregate annual rent due under the SLB Leases is approximately $1.1 million and the initial terms of the SLB Leases are between 16 and 20 years. Pursuant to the Plan, the Debtors intend to assume the SLB Leases in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

III.    **KEY EVENTS LEADING TO THE RESTRUCTURING**

A.    **OPERATIONAL AND INDUSTRY PRESSURES**

29.    The Company's business performance has deteriorated as a result of decreased drilling and well completion activity, tightness in the skilled labor market and unprofitable lump-sum contracts.

30.    The Company's performance is closely linked to market trends in the oil and gas industry and, in particular, capital and operating expenditures in the industry. Due to prior pressures in the oil and gas industry from a severe and pervasive downturn in oil and commodities prices, the oil and gas industry has experienced significant declines in activity levels that began in late 2014. This slump caused dozens of companies engaged in the oil and gas industry to commence chapter 11 proceedings. As a result of this sustained market downturn, oil and gas companies around the world have dramatically curtailed capital and operating expenditures dedicated to oil and gas exploration, development and production. In turn, the financial slump in the oil and gas industry has caused a commensurate drop in demand for the products and services offered by the well site servicers, such as the Company and its competitors, that depend on oil and natural gas producers to whom these services are provided.

31.    The Company thus experienced decreased drilling and well activity by operators beginning in late 2014, which adversely impacted the Company's operations. Adjusted EBITDA declined from a peak of over $71 million in 2014 to a trough of $(6.5) million in 2017. Adjusted EBITDA margins declined from nearly 30% to negative over that period. The Company's credit ratings deteriorated over this period as profitability and margins declined.

32.    Operators have become increasingly focused on service costs and have pushed for rate cuts and reduced overtime and fixed-priced work. The Company was also increasingly bidding against other firms for work, further putting pressure on margins. As the oil and gas

market has recovered, operators have remained focused on costs and, while the Company has been pushing for rate increases, there is still less overtime work and more fixed-price work than existed prior to the downturn. In addition, the Company is experiencing higher labor rates and has not been able to fully offset those labor rate increases with the additional pricing increases.

33.     The Company has not benefited from the trends that have allowed certain completions-focused businesses within the upstream equipment and services space, such as pressure pumping, coiled tubing, sand, frac consumables and well flow management companies, to see significant margin improvement in recent quarters due to tightening supply and demand dynamics. These businesses, unlike the Company's, have benefited from increased well intensity, including longer laterals, increased sand and fluid per lateral foot, tighter stage spacing and increased clusters per stage, which have not directly impacted the demand for the Company's services.

34.     Demand for the Company's services are driven more by the number of wells completed and are less impacted by the way in which those wells are completed. For example, in the Permian Basin, the number of stages forecasted to be completed in 2018 was 50% above the number of stages completed in 2014.  However, the number of wells forecasted to be completed in 2018 in the Permian Basin is still almost 50% below the number of wells completed in 2014.

35.     Further, the Company employs highly skilled technical employees with expertise in electrical engineering. There is a high demand for skilled workers like the Company's employees, which has led to increased salaries and benefits for employees. This, in turn, has compressed revenue margins, which are based on the hourly billing by the Company's employees. In addition, the Company has historically experienced a relatively high employee turnover rate resulting from the fungibility of the labor force.

36.     The Company also entered into certain lump-sum contracts for fixed prices, which were bid with low margins. In particular, MAC Supply, Inc. Electrical Contractors and Strong Electric, LLC entered into these low margin arrangements with customers outside of the oil and gas industry. The Company was not able to leverage its industry expertise and was unable to profitably complete these contracts, thereby adversely impacting the overall profitability of the Company.

### B.     STRATEGIC RESPONSES AND RESTRUCTURING NEGOTIATIONS

37.     The Company has worked diligently to respond to the market downturn and other pressures facing the Company and has undertaken extensive efforts on a number of different fronts. As described below, the Company has implemented broad cost-saving measures to reduce operating expenses while preserving operational capacity and revenue margins. The Company has also instituted a revised business strategy in response to changing industry and customer demands, seeking to optimize revenue from its existing products and services while pursuing new revenue opportunities.

38.     The Company's board and management have undertaken a number of initiatives to improve the Company's performance and position it for growth. It is my understanding that, prior to my hiring in January 2018, the Company overhauled its executive team by replacing its prior Chief Executive Officer with me and also hired a new Chief Financial Officer and Corporate Controller to help identify and ameliorate working capital-related issues.

39.     The Company also has and plans to continue to replace underperforming branch managers to improve utilization, pricing and inventory efficiencies across all locations. In addition, the Company closed its MAC Supply business line in the first quarter of 2018 and is currently winding down its Strong Electric business, which is expected to be completed in the near term. Further, the Company believes that its implementation of human capital initiatives,

01:23810129.2

such as hiring a new head of human resources and focusing on reshaping branch culture, will help retain employees, who are vital to the Company's success. In turn, the new head of human resources has been charged with implementing such employee-based retention initiatives, which the Company believes will ultimately lead to sustainable long-term success and profitability. Specific programs designed to strengthen employee relationships have included opening lines of communication between management and the Company's employees, increasing onboarding efforts for new employees, implementing additional training programs for existing ones and starting initiatives aimed at developing leadership skills.

40.     Finally, the Company believes it will drive margin performance by focusing on high grade customers, rolling out price increases and refocusing on core time and materials businesses.

41.     Despite the strategic shifts described above aimed at improving operational performance, the Company still faces a capital structure that is not well-tailored to the Company's recent operational profitability shortcomings. The Company thus has sought to evaluate alternatives to improve its financial performance, including preserving liquidity.

42.     To this end, in October 2017, the Company entered into the Prepetition Unsecured Loan Agreement with the Sponsor to extend unsecured financing to the Company. As described above, these loans provided the Company with crucial financing at a time when the Company required additional liquidity at rates and on terms that could not otherwise be obtained in the open market. In addition, in the beginning of 2018, the Company pursued a sale-leaseback transaction for certain of its real estate assets with an unaffiliated third party on an arms'-length basis. When it became clear that such transaction would not close timely enough for the Company, the Sponsor agreed to the sale-leaseback transaction on arms'-length terms

substantially similar to those negotiated with the unaffiliated third party. Through these two financing arrangements, the Sponsor granted the Company significant liquidity and runway to right-size its operations and pursue a comprehensive and substantially consensual financial restructuring.

43.     Accordingly, in January 2018, the Debtors engaged PJT Partners LP ("PJT"), as investment banker, to assist in opportunistically addressing the Company's capital structure. The Debtors also engaged Simpson Thacher & Bartlett LLP ("STB") as legal counsel and, later, Young Conaway Stargatt & Taylor LLP ("YCST" and, together with PJT and STB, the "Company Advisors"), as Delaware restructuring co-counsel. Together with STB, and, later, YCST, PJT initially helped facilitate diligence with respect to the business plan, taxes, and legal structuring and evaluated options for raising incremental capital to fund ongoing cash losses.

44.     Specifically, PJT initially worked with the Debtors to assist in their preparation of a long-term business plan that served, in part, as a cornerstone for determining appropriate capital structure alternatives and, later, to build momentum and support for the Debtors' turn-around efforts. The Company Advisors, in tandem with the formulation of a long-term business plan, evaluated solutions to the Debtors' tightening liquidity and the upcoming December 2018 revolving credit facility maturity under the Prepetition Secured Credit Agreement and more broadly analyzed the sustainability of the capital structure and the likelihood of refinancing the revolver upon its maturity in December 2018 and the term loan upon its maturity in December 2020. Given the Debtors' liquidity short-falls, PJT assisted the Debtors in sizing the Debtors' new money needs required to be invested in the business to catch up past-due trade vendors and to provide a reasonable operational cushion. PJT further assisted the Debtors in exploring strategic alternative out-of-court financing arrangements in early 2018 that was intended to

address the upcoming December revolver maturity. However, the required liquidity needs of the Debtors pursuant to such financing could not be achieved on feasible terms. Accordingly, and based on the analysis by the Company Advisors, the Debtors determined that their projected cash flows could not support the current cash interest burden and a refinancing of the debt as it became due was highly unlikely. Accordingly, the extinguishment of all or substantially all of the Debtors' approximately $300 million of funded indebtedness was required, which could not be achieved consensually without the lenders' agreement to convert such debt into equity.

45.     In June 2018, recognizing the importance of swift action to preserve liquidity and enterprise value, and on the advice of its advisors, the Debtors authorized PJT to begin reaching out to certain Prepetition Secured Lenders regarding a proactive and consensual deleveraging of the Company's balance sheet to achieve greater operational flexibility. In July 2018, the Debtors and its advisors initiated discussions with the largest holders of the Prepetition Secured Lenders.

46.     Around June 2018, certain Prepetition Secured Lenders formed an ad hoc group (the "Ad Hoc Group") and retained Davis Polk & Wardwell LLP, as legal counsel ("DPW"). In turn, for the benefit of the Ad Hoc Group, DPW formally retained Ankura Consulting Group, LLC, as financial advisor ("Ankura and, together with DPW, the "Prepetition Secured Lender Advisors"), in August 2018. Upon such retention, the Prepetition Secured Lender Advisors conducted significant diligence of the Company for the benefit of the Prepetition Secured Lenders, including holding multiple meetings with the Company and the Company Advisors. After conclusion of diligence by the Prepetition Secured Lender Advisors and the Company Advisors, the Ad Hoc Group and the Company negotiated the material terms of a potential comprehensive restructuring and recapitalization of the Company.

47.    Beginning in August 2018, the Company and the Ad Hoc Group exchanged term sheets for a possible transaction and, through good faith and arms'-length negotiations, worked collaboratively and constructively towards a consensual restructuring. Because of productive discussions between the Company, the Company Advisors, the Ad Hoc Group and the Prepetition Secured Lender Advisors, the Ad Hoc Group, constituting the Required Lenders (as defined in the Prepetition Secured Credit Agreement) and the Prepetition Agent, at the direction of the Required Lenders, executed that certain Forbearance Agreement, dated August 31, 2018 (the "Initial Forbearance Agreement"), pursuant to which, the Ad Hoc Group and the Prepetition Agent, at the direction of the Required Lenders, agreed to forbear from exercising certain rights and remedies under the Prepetition Secured Credit Agreement and the other Prepetition Secured Loan Documents as a result of certain Specified Defaults (as defined in the Forbearance Agreement and identified on Schedule I thereto) becoming an Event of Default under and as defined in the Secured Credit Agreement through and until September 28, 2018 (the "Initial Forbearance Termination Date").

48.    The parties to the Initial Forbearance Agreement entered into that certain Amended and Restated Forbearance Agreement, dated September 28, 2018 (the "A&R Forbearance Agreement"), as further extended by email pursuant to its terms, and as further amended and restated in its entirety by that certain Second Amended and Restated Forbearance Agreement (the "Second A&R Forbearance Agreement" and, together with the A&R Forbearance Agreement and the Initial Forbearance Agreement, the "Forbearance Agreement"), dated October 23, 2018, pursuant to which Forbearance Agreement, collectively and among other things, the parties thereto agreed to extend the Initial Forbearance Termination Date through and until November 2, 2018 (the "Extended Forbearance Termination Date"). The

Forbearance Agreement provided the parties to the restructuring negotiations sufficient time to execute on a consensual and value maximizing restructuring, which ultimately became the foundation for the RSA that provided for, among other things, the equitization of all of the secured debt, terms of a DIP Facility to fund the Chapter 11 Cases and payments to trade vendors, among other things, and terms of an exit facility.

### C.    RESTRUCTURING SUPPORT AGREEMENT

49.    In October 2018, the Existing Board convened to consider the material terms of a restructuring proposal and authorized the Debtors' entry into the RSA, concluding that the terms of the RSA and the Restructuring Transactions are in the best interests of the Company, its creditors and its other stakeholders, including the Holders of Claims in the Voting Classes.  The RSA, executed on October 26, 2018, outlines a restructuring process and post-reorganization capital structure that is designed to de-lever the Debtors' balance sheet and provides for an expedient emergence from chapter 11.  Pursuant to the RSA, the Consenting Prepetition Secured Lenders, the Prepetition Agent, the DIP Lenders, the Prepetition Unsecured Lender and the Consenting Equityholder have agreed to, as applicable, among other things: (i) support and complete the Restructuring Transactions in accordance with the RSA and the Plan; (ii) vote their Claims, as applicable, in favor of the Plan; (iii) support confirmation of the Plan and the Debtors' entry into each of the Plan Documents; (iv) not seek or support any alternative Restructuring Transactions or take any action inconsistent with the Plan; (v) commit to provide the financing under the DIP Facility and the exit facility; (vi) further extend the Extended Forbearance Termination Date through and until the Effective Date or upon the termination of the RSA in accordance therewith; and (vii) approve such other definitive documentation as contemplated under the RSA, the Ballots and other materials related to the solicitation of votes for the Plan, and any other agreements, instruments, petitions, motions, pleadings, orders and/or documents

01:23810129.2

that are filed by the Debtors in connection with the Plan and Disclosure Statement or the Chapter 11 Cases.  The transactions contemplated by the RSA represent a comprehensive resolution of extensive and complex issues relating to the Debtors to be implemented through the Plan.

### D.    IMPORTANCE OF DELEVERAGING

50.    As the Debtors' financial performance has deteriorated, their capital structure has become increasingly unsustainable, and debt-service obligations have consumed an increasing percentage of the Debtors' free cash flow.  Given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in their businesses, the Debtors have determined that deleveraging their capital structure is an absolute necessity. Accordingly, the Debtors commenced the Chapter 11 Cases primarily to implement the pre-packaged balance sheet restructuring contemplated under the RSA and to enable them to execute on their new business plan and capitalize on their growth opportunities.

51.    Significantly, this reorganization carries the support of the Consenting Prepetition Secured Lenders holding over 67% in amount of the Secured Loan Claims and the Prepetition Unsecured Lender, which are Holders of Claims in the only Voting Classes under the Plan, as well as the DIP Lenders, which have committed to provide crucial funding during the Chapter 11 Cases and funding upon emergence.  The Debtors, the Consenting Prepetition Secured Lenders, the Prepetition Unsecured Lender, the Prepetition Agent, the DIP Lenders and the Consenting Equityholder are all signatories to the RSA, which requires the parties to support the reorganization contemplated under the Plan, including, as applicable, vote their Claims to accept the Plan.  This level of consensus for a comprehensive reorganization reflects not only the enormous efforts undertaken by the Debtors, the Ad Hoc Group, the DIP Lenders, the Prepetition Agent, the Prepetition Unsecured Lender and the Consenting Equityholder over recent months, but also the parties' belief in the Debtors' prospects as a reorganized enterprise.

52.     Notably, the restructuring is a pure balance sheet restructuring at the corporate level and is not intended to be an operational restructuring of the Company.  In implementing the restructuring, the Company's primary focus is on ensuring its business operations are substantially uninterrupted and implementing a corporate level deleveraging as efficiently as possible.

### E.     PREPETITION SOLICITATION OF THE PLAN

53.     Shortly after execution of the RSA, the Debtors and the Ad Hoc Group, among others, negotiated and documented the Plan and Disclosure Statement.  On October 31, 2018, the Debtors commenced solicitation of the Plan of the Holders of Secured Loan Claims in Class 1 and the Holder of Unsecured Loan Claims in Class 4, the only classes of creditors or interest holders entitled to vote on the Plan.

54.     Given the consensus among the Voting Parties evidenced by the RSA, which requires the Voting Parties party thereto, among other things, to vote their Claims to accept the Plan, the Debtors are optimistic that they will emerge from chapter 11 expeditiously, with an optimized balance sheet that will allow the Reorganized Debtors to be best positioned to execute successfully on their business plan at a crucial juncture for the Company.  Such an outcome is in the best interests of the Debtors and all of their stakeholders.

## IV.    FIRST DAY MOTIONS

55.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking targeted relief intended to allow the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations.  The First Day Motions seek authority to, among other things, enter into the DIP Facility, including to obtain the borrowings thereunder, to pay prepetition claims of trade creditors, prepetition wages and employee benefit and taxes, honor their obligations under existing insurance policies and with

certain essential utility providers and maintain the Company's current cash management system and ensure the continuation of the Company's business operations without interruption.  The Claims of all creditors other than the Secured Loan Claims and the Unsecured Loan Claims are Unimpaired under the Plan, and thus the first-day relief requested is consistent with the treatment of such Unimpaired claims.  Court approval of the relief requested in the First Day Motions is necessary to ensure the ongoing and smooth operations of the Debtors while the balance sheet restructuring of the Debtors is implemented through the Chapter 11 Cases.

56.     I have reviewed each of the First Day Motions.  The facts and descriptions of the relief requested therein are detailed below and are true and correct to the best of my information and belief.  I believe that the relief sought in each of the First Day Motions is necessary to: (i) enable the Debtors to continue their operations in the ordinary course with minimal disruption and (ii) minimize any loss of the Company's value.

57.     I believe that if the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors, and other parties in interest—will be substantially enhanced.  Accordingly, I believe that the Court should grant each of the First Day Motions.[5]

## A.     DEBTORS' MOTION FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES (THE "JOINT ADMINISTRATION MOTION").

58.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of the Chapter 11 Cases and the consolidation thereof for procedural purposes only.   Given the integrated nature of the Debtors' operations, joint

---

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions, filed contemporaneously herewith.

administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

59.    Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each and every Debtor entity, as the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of the Chapter 11 Cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of thirteen independent chapter 11 cases.  The thirteen Debtors in the Chapter 11 Cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  The Debtors also share significant debt obligations that they seek to restructure as part of the Chapter 11 Cases.

60.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to manage their business operations in chapter 11 without disruption.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

**B.**     **DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) SCHEDULING COMBINED HEARING ON ADEQUACY OF DISCLOSURE STATEMENT AND CONFIRMATION OF PRE-PACKAGED PLAN; (II) FIXING DEADLINE TO OBJECT TO DISCLOSURE STATEMENT AND PRE-PACKAGED PLAN; (III) APPROVING PREPETITION SOLICITATION PROCEDURES AND FORM AND MANNER OF NOTICE OF COMMENCEMENT, COMBINED HEARING AND OBJECTION DEADLINE; (IV) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (V) CONDITIONALLY (A) DIRECTING THAT THE UNITED STATES TRUSTEE NOT TO CONVENE SECTION 341(a) MEETING OF CREDITORS AND (B) WAIVING REQUIREMENT OF FILING STATEMENTS OF FINANCIAL AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES; AND (V) GRANTING RELATED RELIEF (THE "<u>SCHEDULING MOTION</u>").**

61.     Pursuant to the Scheduling Motion, the Debtors request entry of an order: (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan (the "<u>Combined Hearing</u>"); (b) establishing the deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan (the "<u>Objection Deadline</u>"); (c) approving the prepetition solicitation procedures  (the "<u>Solicitation Procedures</u>"), including the forms of ballots and the form and manner of the notice of the commencement of the Chapter 11 Cases, the Combined Hearing and the Objection Deadline (the "<u>Combined Notice</u>"); (d) approving the notice and objection procedures, including the applicable deadline, for the assumption or rejection of executory contracts and unexpired leases (the "<u>Executory Contract Procedures</u>"); (e) conditionally (i) directing that the U.S. Trustee not convene a meeting of the creditors (the "<u>Creditors' Meeting</u>") under section 341(a) of the Bankruptcy Code and (ii) excusing the requirement that the Debtors file statements of financial affairs ("<u>SOFAs</u>") and schedules of assets and liabilities ("<u>Schedules</u>"); and (f) granting related relief.

62.     In connection with the foregoing, the Debtors request that the Court approve the following proposed dates and deadlines relevant to the Solicitation Procedures and Combined Hearing:

| Event | Date/Deadline |
|---|---|
| Voting Record Date | October 29, 2018 |
| Commencement of Solicitation | October 31, 2018 |
| Petition Date | November 2, 2018 |
| Voting Deadline | November 20, 2018 at 5:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Objection Deadline | December 6, 2018, at 4:00 p.m. (Prevailing Eastern Time) |
| Executory Contract Objection Deadline | December 6, 2018, at 4:00 p.m. (Prevailing Eastern Time) |
| Plan Supplement Deadline | December 3, 2018, at 4:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Reply Deadline (including, to the extent applicable, replies to any Executory Contract Procedures objections) | December 11, 2018 at 10:00 a.m. (Prevailing Eastern Time) |
| Deadline to file proposed confirmation order | December 11, 2018 at 10:00 a.m. (Prevailing Eastern Time) |
| Deadline to file brief in support of confirmation | December 11, 2018 at 10:00 a.m. (Prevailing Eastern Time) |
| Second Day Hearing and Combined Hearing | December 13, 2018, at _:00 a/p.m. (Prevailing Eastern Time) |

63.     The Debtors commenced solicitation with respect to the Plan prior to the Petition Date. The Debtors propose to solicit for 20 days in accordance with the Solicitation Procedures described in the Scheduling Motion, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.   On October 31, 2018, the Debtors caused their Voting Agent, Prime Clerk LLC, to distribute the Disclosure Statement, Plan and the appropriate Ballot to each of the Holders of Claims in the Voting Classes (collectively, the "Solicitation Package") and the Voting Deadline has been set for November 20, 2018 (unless the Debtors determine otherwise or as permitted by the Court).

64.    The Ballots substantially conform to Official Form No. 14.  Holders that received the Solicitation Package were directed in the Disclosure Statement and applicable Ballot to follow the instructions contained in the Ballot (and described in the Disclosure Statement) to complete and submit the respective Ballots to cast a vote to accept or reject the Plan.  Each Holder was explicitly informed in the Disclosure Statement and applicable Ballot that such Holder needed to submit its Ballot so that it is actually received by the Voting Agent on or before the Voting Deadline to be counted.  Certain Holders of Claims or Equity Interests were not provided a Solicitation Package because such Holders are: (a) conclusively presumed to accept the Plan, under section 1126(f) of the Bankruptcy Code, because such Holders are unimpaired; or (b) conclusively deemed to reject the Plan, under section 1126(g) of the Bankruptcy Code, because such Holders are impaired and entitled to receive no distribution on account of their Claims or Equity Interests.

65.    Each of the Debtors will be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and the Plan, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.  The Debtors will cause notice of any such rejection to be served on the counterparties thereto, including notice of procedures for resolving any disputes arising thereunder.  The Combined Notice will provide that the proposed cure amount (the "Cure Amount") for nearly all of those Executory Contracts and Unexpired

Leases proposed to be assumed will be $0. Executory Contracts and Unexpired Leases that the Debtors propose to assume or reject will be identified in the Plan Supplement or a separate filing with the Court and in notices served on the counterparties to such Executory Contracts and Unexpired Leases at least ten (10) days before the Combined Hearing, provided, however, that to the extent an Unexpired Lease or Executory Contract is not listed in the Plan Supplement or such notices, the Cure Amount will be $0. Any non-zero Cure Amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree in writing.

66.    The Scheduling Motion also notes that the Debtors began soliciting acceptance of the Plan prepetition and anticipate the near-term confirmation of the Plan and subsequent emergence from chapter 11, the failure of which, if certain milestones are not met under the RSA, could jeopardize certain stakeholders' previously obtained support for the Plan. Accordingly, the Debtors seek an extension and conditional waiver of the Creditors' Meeting and the filing of SOFAs and Schedules. Holders of Claims are either Unimpaired under the Plan or have agreed to support the Plan pursuant to the RSA. Therefore, the Debtors submit that their creditors are not prejudiced by the lack of a Creditors' Meeting. Furthermore, the request for a final waiver of the requirement to file the Schedules and SOFAs is appropriate given the pre-packaged nature of the Plan. The purpose of filing Schedules and SOFAs is to permit parties in interest to understand the Debtors' assets and liabilities to facilitate plan negotiations. Here, the Debtors have already negotiated with, and solicited votes from, all stakeholders impaired under the Plan. Additionally, much of the information that would be contained in the Schedules and SOFAs is already available in the Disclosure Statement, which was sent to parties entitled to vote to accept or reject the Plan prior to the Petition Date.

67.     I believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to effectuate expeditiously their restructuring and preserve value, minimize administrative expenses of each of the Estates and cause each of the parties in interest to be properly informed as promptly as possible of the anticipated schedule of events for confirmation of the Plan.  Accordingly, I respectfully submit that the Scheduling Motion should be approved.

**C.     MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c) ("DIP MOTION").[6]**

68.     On the Petition Date, the Debtors filed a motion seeking approval of, among other things, the DIP Financing, which consists of a senior secured term loan credit facility in an aggregate principal amount of up to $17.5 million to be provided by the lenders party to the DIP Credit Agreement from time to time and under which Wilmington Trust, National Association will act as administrative agent and collateral agent. The DIP Facility will be committed financing for the Debtors upon entry of the Interim Order.  Prior to entry of the Final Order, the Debtors will be able to borrow up to $15 million under the DIP Facility, with the remaining balance available upon entry of the Final Order.

69.     The Debtors also seek approval of the continued use of the Prepetition Secured Parties' collateral, including Cash Collateral, to which the requisite Prepetition Secured Parties

---

[6]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim DIP Order, substantially in the form attached as Exhibit A to the DIP Motion.

have consented. Such use of collateral, together with the DIP Financing, will provide the Debtors with sufficient liquidity to implement the Plan and maintain uninterrupted business operations during the Chapter 11 Cases. Without the liquidity afforded by the DIP Financing and use of Cash Collateral, the Debtors would be forced to confront business and operational pressures that would impair their ability to consummate the Plan, ultimately to the detriment of the Debtors' various stakeholders. The DIP Facility will be used to, among other things, provide incremental liquidity to fund the Debtors' businesses through the effective date of the Plan. Further, the DIP Facility will be converted into exit financing subject to satisfying certain terms and conditions set forth in the Restructuring Support Agreement, including the consummation of the Plan. This is an important feature that gives the Debtors more certainty with respect to liquidity after emerging from bankruptcy.

70.    The Debtors propose to provide the Secured Parties with the following adequate protection package:

- reasonable and documented fees, costs and expenses of counsel and other advisors to the Prepetition Agent and the Ad Hoc Lender Group;

- replacement liens, liens on unencumbered property and superpriority claims for diminution in the value of the interest in collateral of the Prepetition Secured Parties;

- financial reporting and other reports and notices delivered by the Borrower under the DIP Facility;

- the Milestones (as defined in the DIP Credit Agreement) may be amended, modified or extended only by order of the Bankruptcy Court or the prior written consent of the Required DIP Lenders; and

- waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code (subject to entry of the Final Order), the equitable doctrine of marshaling, limitations on the use of collateral and stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties.

71.     I understand that courts in this jurisdiction have approved similar requests for relief in other recent chapter 11 cases.  Accordingly, I believe that the agreed-upon adequate protection package is fair, reasonable and appropriate under the circumstances of the Chapter 11 Cases.

72.     As set forth more fully in the Laurinaitis Declaration, the Debtors believe that the DIP Financing pending approval before the Court represents the Debtors best available financing option. I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

**D.      DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO USE THEIR CASH MANAGEMENT SYSTEM, INCLUDING EXISTING BANK ACCOUNTS AND EMPLOYEE CARD PROGRAMS, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) CONTINUE INTERCOMPANY TRANSACTIONS, AND (D) MAINTAIN EXISTING CHECK AND BUSINESS FORMS; (II) WAIVING THE REQUIREMENTS OF SECTION 345(b) ON AN INTERIM BASIS; AND (III) GRANTING RELATED RELIEF (THE "<u>CASH MANAGEMENT MOTION</u>")**

73.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) continue to use their existing cash management system (the "<u>Cash Management System</u>"), including existing bank accounts and Employee Card Programs , (b) honor certain prepetition obligations related thereto, (c) continue, in the ordinary course of business, transactions between and among the Debtors and any non-Debtor affiliates consistent with the Debtors' customary prepetition practices, and (d) maintain their existing check and business forms; (ii) waiving the requirements of section 345(b) of the Bankruptcy Code on an

interim basis; and (iii) granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

74.      The Debtors maintain a centralized Cash Management System, which they use in the ordinary course of business to collect funds generated by their operations and disburse those funds to satisfy obligations required to operate their business.  The Cash Management System is similar to the systems commonly employed by  businesses comparable to that of the Debtors.  As described in further detail below, the Cash Management System comprises the following principal components: (i) a Lockbox Account, by which the Debtors collect cash payments; (ii) a Master Operating Account , used by the Debtors to aggregate cash and make disbursements to satisfy their financial obligations; (iii) Local Disbursement Accounts, through which the Debtors make specific types of disbursements at the regional level of the enterprise and (iv) Legacy Accounts that are currently in the process of being closed.  The Cash Management System also includes the Debtors' Employee Card Programs, which allow the Debtors' employees to charge business-related expenses and purchase fuel in the ordinary course of  the Debtors'  business operations.

75.      The Cash Management System is operated primarily through twenty-one (21) bank accounts (collectively, the "Bank Accounts") maintained by the Debtors at three (3) banking institutions (collectively, the "Banks").  Specifically, the Cash Management System includes the following Bank Accounts and Banks: (i) four accounts with Bank of America, N.A. ("BofA"); (ii) fifteen accounts with Prosperity Bank ("Prosperity"); and (iii) two legacy accounts at Comerica Bank ("Comerica").[7]  A schedule of the Bank Accounts, including the last four

---

[7]       Contemporaneously herewith, the Debtors have filed the *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service;(II) Deeming Utility Providers Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining*

digits of each account number and the Debtor associated with each account, is attached as Exhibit 1 to the Interim Order attached to the Cash Management Motion.

76.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to manage their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**E.    MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF TRADE CREDITORS, (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF (THE "PAY TRADE MOTION")**

77.    In the ordinary course of business, the Debtors obtain goods and services from numerous creditors that support the Debtors' operations (collectively, the "Trade Creditors"). These Trade Creditors provide, among other things, maintenance and repair services, supplies, rental equipment, materials, and mechanical work, as well as goods and services in support of the Debtors' corporate and administrative functions including financial, tax, and legal services.  I believe that the goods and services provided by the Trade Creditors are necessary for the continued operation of the Debtors' businesses.

78.    Pursuant to the Pay Trade Motion, the Debtors seek entry of an interim order and a final order (i) authorizing the Debtors, in their discretion, to pay certain prepetition fixed, liquidated, and undisputed claims of Trade Creditors (collectively, the "Trade Claims") in the

---

*Adequate Assurance of Payment; and (IV) Granting Related Relief* (the "Utilities Motion").  As set forth in the Utilities Motion, the Debtors are proposing to deposit an initial sum equal to 50% of the Debtors' estimated average monthly cost of utility service into a newly created, segregated, interest-bearing account (the "Adequate Assurance Account") within twenty (20) days of the Petition Date.  The Debtors will maintain the Adequate Assurance Account during the Chapter 11 Cases in accordance with the terms set forth in the Utilities Motion.

ordinary course of business and consistent with past practice or as otherwise agreed to between the Debtors and the applicable Trade Creditors up to a cap of $7.3 million in the interim order and $9.1 million in the final order, (ii) authorizing applicable banks and other financial institutions to honor and process related checks and transfers, and (iii) granting certain related relief, including scheduling a hearing to consider approval of this Motion on a final basis.

79.     Although the majority of such Trade Claims would be classified as general unsecured claims under the Plan, certain Trade Claims may be (a) administrative priority claims under sections 503(b)(9) of the Bankruptcy Code or (b) secured by liens under applicable state law.  The Debtors have paid $4.6 million per month on average to Trade Creditors since January 2018.

80.     The Debtors are not seeking to pay all Trade Claims immediately; rather, if authorized by the Court to pay such claims, the Debtors will process such payments in accordance with their normal accounts payable procedures, as they become due and payable in the ordinary course of the Debtors' businesses and consistent with past practice or as otherwise agreed to between the Debtors and the applicable Trade Creditors.  The financing sought in the DIP Motion will provide the Debtors with ample funding to pay the Trade Claims and the Debtors' budget specifically contemplates such funding..[8]

81.     It is a sound exercise of the Debtors' business judgment to pay the Trade Claims as they become due in the ordinary course of business because doing so will help the Debtors avoid the potential for value destroying business interruption during the Chapter 11 Cases.  The goods and services provided by Trade Creditors are necessary for the continued operation of the

---

[8]     Concurrently herewith, the Debtors have filed the Debtors' DIP Motion, seeking use of such cash pursuant to the terms set forth therein and the interim order attached thereto as Exhibit A.

Debtors' businesses. Irrespective of the proposed plan treatment leaving Trade Creditors unimpaired, the Debtors anticipate that the failure to pay certain Trade Claims as they become due would likely result in certain Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms. Indeed, where a Trade Creditor may itself be facing financial hardship, the Debtors' failure to pay Trade Claims may leave such Trade Creditor with little choice but to stop working for, or providing deliveries to, the Debtors.

82.     This chain of events could lead to a material disruption to the Debtors' operations, and cause irreparable harm to the Debtors' businesses, goodwill, market share, and ultimate ability to restructure pursuant to the Plan. Replacement vendors and the search for such vendors, even to the extent available, would likely result in substantially higher costs for the Debtors and/or subject the Debtors to risk of operational shutdowns and noncompliance with state regulations. Moreover, the Debtors cannot rely on bringing motions to compel Trade Creditors to perform to address any potential holdups as their primary means of ensuring an uninterrupted supply of goods and services. A disruption may occur before the Debtors would be able to successfully bring an action in the Court to compel performance or otherwise enforce the automatic stay. In addition, the Debtors interact with the Trade Creditors pursuant to a variety of arrangements, including many arrangements that are not executory in nature. The counterparty of such an arrangement may decide not to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors, and would be under no obligation to do so.

83.     In short, if the Trade Creditors refuse to transact with the Debtors or limit credit or other trade terms, the operations of the Debtors' businesses will likely be significantly

disrupted.  Authority to pay the Trade Claims as they come due will assist the smooth transition

into and out of the Chapter 11 Cases and will ensure the Debtors' continued operation during the

intervening period.  Moreover, no party in interest will be prejudiced by the relief requested

herein because the Trade Claims are unimpaired under the Plan and will be paid in full upon the

effective date of the Plan.  Thus, the relief requested herein seeks to alter only the timing, not the

amount or priority, of such payments.

84.     I believe that the relief requested in the Pay Trade Motion is in the best interests

of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to manage their businesses in chapter 11 without disruption.  Accordingly, I

respectfully submit that the Pay Trade Motion should be approved.

**F.      DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION TAXES, (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF (THE "<u>TAXES MOTION</u>")**

85.     Pursuant to the Taxes Motion, the Debtors seek entry of an order (i) authorizing,

but not directing, the Debtors, in their discretion, to pay (or use tax credits to offset) the Taxes

(as defined herein), and (ii) granting related relief, including (a) authorizing applicable banks and

other financial institutions to honor and process related checks and transfers, and (b) scheduling

a hearing to consider approval of this Motion on a final basis (the "<u>Final Hearing</u>").

86.     Although the Debtors believe that they are substantially current on all of the

Taxes that have become due as of the Petition Date, because many such Taxes are paid on a

periodic basis (and in arrears), there is often a lag between the time when the Debtors incur an

obligation to pay the Taxes and the date such Taxes become due and payable.  The Debtors

estimate that up to approximately $400,000 in Taxes relating to the prepetition period will become due and owing after the Petition Date.

87.     The relief requested in the Taxes Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and going-concern values of their estates.  Payment of the prepetition Taxes is critical to the Debtors' uninterrupted operations.   Nonpayment of these obligations may cause certain Taxing Authorities to take precipitous actions, including, but not limited to, initiating audits, preventing the Debtors from conducting business in applicable jurisdictions, seeking to modify the automatic stay, attempting to file liens against the Debtors' real and personal property, and/or pursuing other remedies, all of which would disrupt the Debtors' day-to-day operations, hinder the Debtors' efficient and effective administration of the Chapter 11 Cases, and burden the Debtors' estates with unnecessary expenses.  Certain of the Debtors' directors and officers might also be subject to personal liability—even if the nonpayment of Taxes was not a result of any malfeasance on their part—which would distract such key personnel from their duties related to the Debtors' restructuring.  In some instances, Taxing Authorities may be able to pursue one or more of the above-described remedies notwithstanding the Debtors' bankruptcy filings.  Further, payment of the prepetition Taxes may actually reduce the amounts ultimately paid to the Taxing Authorities, and thus expand the Debtors' estates, because penalties and interest will be avoided by prompt payment.   Accordingly, for these reasons, and the supporting authority found in sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors submit that the relief requested is essential, appropriate, and in the best interests of their estates and should be granted.

88.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to manage their businesses in chapter 11 without disruption.    Accordingly, I respectfully submit that the Taxes Motion should be approved.

### G. DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT, AND (IV) GRANTING RELATED RELIEF (THE "UTILITIES MOTION")

89.    Pursuant to the Utilities Motion, the Debtors are seeking entry of an interim order and final order (i) prohibiting the Debtors' utility providers (each a "Utility Provider" and collectively, the "Utility Providers") from altering, refusing, or discontinuing service to the Debtors, except as set forth therein, (ii) deeming the Utility Providers adequately assured of future performance, (iii) establishing procedures for resolving requests for additional adequate assurance of payment and authorizing the Debtors to provide additional or alternative adequate assurance of future payment to the Utility Providers, and (iv) granting related relief, including scheduling a hearing to consider approval of this Motion on a final basis.

90.    To operate their businesses and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications, data, wireless, and other similar services (collectively, the "Utility Services").    These services are provided by approximately sixty (60) Utility Providers, with which one or more of the Debtors may have multiple accounts.[9]    The Debtors spend an aggregate amount of approximately $63,000.00 each month on Utility Services from the Utility Providers listed on the Utility Services List.    By the Utilities Motion, the Debtors also seek authority from

---

[9]    The Debtor-obligor varies depending on the Utility Services/Utility Providers at issue.    Although not all of the Debtors are necessarily obligated on account of the Utility Services, it is possible that multiple Debtors may be obligated to the Utility Providers for such services.    For these reasons, and for ease of reading, the term "Debtors" is generally used throughout this Motion.

the Court to continue such payments for postpetition services (together with payments to Utility

Providers for Utility Services, the "Utility Obligations").

91.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations,

and, therefore, to the success of the Debtors' reorganization efforts.  Indeed, any disruption in

utility services—even for a brief period of time—would seriously disrupt the Debtors' continued

operations.  The Debtors operate a complex business with operations in several states around the

country that depend on the reliable delivery of power and other Utility Services.  Should any

Utility Provider refuse or discontinue service even for a brief period, the Debtors' operations

could be severely disrupted.  Such a disruption would negatively impact the Debtors' business

operations and revenue and could jeopardize the Debtors' reorganization efforts and, ultimately,

creditors' recoveries.  In addition to their corporate headquarters, the Debtors operate several

regional and field offices responsible for ensuring the smooth operation of the Debtors'

businesses.  These offices require Utility Services to operate.

92.     I believe that the relief requested in the Utilities Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to continue to manage their businesses in chapter 11 without disruption.   Accordingly, I

respectfully submit that the Utilities Motion should be approved.

**H.      DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO CONTINUE THEIR INSURANCE POLICIES AND PAY ALL OBLIGATIONS IN RESPECT THEREOF, (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF (THE "INSURANCE MOTION")**

93.     Pursuant to the Insurance Motion, the Debtors are seeking entry of an order

(i) authorizing the Debtors to continue their insurance policies, satisfy payment of prepetition

obligations related thereto, and enter into any new premium financing agreements,

(ii) authorizing applicable banks and other financial institutions to honor and process related checks and transfers, and (iii) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing").

94.     Prior to the Petition Date, the Debtors maintained various liability, property, and other insurance policies (whether current or expired, and together with any agreements related thereto, the "Insurance Policies") through several different insurance carriers (together with any third-party administrators, the "Insurance Carriers") including, but not limited to, the currently in-force Insurance Policies and Insurance Carriers identified in Exhibit C to the Insurance Motion.   The Insurance Policies provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability, directors' and officers' liability (including excess liability), employment practices liability, fiduciary liability, automobile liability, property liability, pollution liability, and workers' compensation.  The Insurance Policies also include any new or similar policies entered into by the Debtors after the date hereof due to expiration or otherwise.  Currently, the Debtors are parties to a premium financing agreement (the "Premium Financing Agreement") with third-party lender Talbot Premium Financing, LLC (the "Financing Party") to finance all the Insurance Policies except for the pollution liability insurance policy (the "Financed Policies").

95.     The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Policies or the Premium Financing Agreement could result in one or more of the Insurance Carriers or the Financing Party terminating the existing policies, declining to renew the Insurance Policies, or refusing to enter into new insurance agreements with the Debtors in the

future.  If the Insurance Policies are allowed to lapse or terminate, the Debtors could be exposed

to substantial liability for damages resulting to persons and property of the Debtors and others,

which exposure could have an extremely negative impact on the value of the Debtors' business.

Furthermore, the Debtors would then be required to obtain replacement policies on an expedited

basis at what would likely be a significantly higher cost to their estates.  Accordingly, the

Debtors seek authority to make all payments with respect to the Insurance Policies and the

Premium Financing Agreement that the Debtors determine, in the exercise of their reasonable

business judgment, must be paid in order to avoid any lapse or termination in coverage.

96.    I believe that the relief requested in the Insurance Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to continue to manage their businesses in chapter 11 without disruption.  Accordingly, I

respectfully submit that the Insurance Motion should be approved.

**I.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, PREPETITION PAYROLL TAXES, AND OTHER COMPENSATION, AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAYMENT OF RELATED ADMINISTRATIVE OBLIGATIONS, (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF (THE "WAGES MOTION")**

97.    Pursuant to the Wages Motion, the Debtors are seeking entry of an order

(i) authorizing the Debtors to (a) pay their outstanding payroll obligations and related

withholdings, deductions, and expense reimbursement obligations, (b) maintain the existing

insurance and other benefits programs that Debtors offer to employees, and (c) satisfy payment

of prepetition obligations related thereto, (ii) authorizing applicable banks and other financial

institutions to receive, process, honor, and pay any and all checks drawn on the Debtors'

accounts and other transfers to the extent that those checks or transfers relate to any of the

foregoing, and (iii) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing").

98.     The employees are an indispensable part of the Debtors' operations, and their continued services are critical to the Debtors' ability to successfully reorganize under chapter 11 of the Bankruptcy Code.  The vast majority of the Debtors' employees rely exclusively on the compensation and other benefits they receive from the Debtors to pay their daily living expenses. The employees and their families would be subject to significant financial hardship if the Debtors could not honor prepetition obligations that may remain outstanding as of the Petition Date and continue to pay employees' compensation and fund their benefits programs without interruption during the pendency of the Chapter 11 Cases.  Moreover, at this early stage of the Chapter 11 Cases, and given their anticipated brief duration, the Debtors simply cannot risk the substantial damage to their business that would inevitably accompany any decline in the morale of their workforce attributable to the Debtors' failure to pay wages and salaries and maintain employee benefits.

99.     Importantly, the Debtors also face a risk of attrition of key employees if they are unable to honor prepetition obligations and continue paying compensation and funding employee benefits programs postpetition.  Absent assurances that such employees will continue to be compensated in the ordinary course, the Debtors' employees may seek opportunities elsewhere, including at competitors of the Debtors.  Losing valuable employees at this stage of the Debtors' restructuring efforts would have a direct and negative impact on the Debtors' abilities to sustain operations and maintain revenues.

100.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to continue to manage their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Wages Motion should be approved.

> **J.    DEBTORS' APPLICATION FOR ENTRY OF AN ORDER APPOINTING PRIME CLERK LLC AS CLAIMS AND NOTICING AGENT PURSUANT TO 28 U.S.C. § 156(c), SECTION 105(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2002(f), AND LOCAL RULE 2002-1(f), EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE (THE "PRIME CLERK RETENTION APPLICATION").**

101.    Pursuant to the Prime Clerk 156(c) Application, the Debtors are seeking authority to retain Prime Clerk as their Claims and Noticing Agent. The Debtors evaluated at least three potential candidates to serve as their Claims and Noticing Agent. Following that review and competitive selection process, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Claims and Noticing Agent, I submit that the appointment of Prime Clerk as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

102.    Based on Prime Clerk's experience in providing similar services in large chapter 11 cases, I believe that Prime Clerk is eminently qualified to serve as Claims and Noticing Agent Agent in the Chapter 11 Cases. A detailed description of the services that Prime Clerk has agreed to render and the compensation and other terms of the engagement are provided in the Prime Clerk 156(c) Application.

103.    I have reviewed the terms of the engagement and believe that Prime Clerk's retention will enable the Debtors to continue to operate their business operations in chapter 11 without disruption, and the Debtors' estates, creditors, parties in interest, and the Court will benefit as a result of Prime Clerk's experience and cost-effective methods. Accordingly, I respectfully submit that the Prime Clerk 156(c) Application should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  November 2, 2018

_/s/ Jerrit Coward_
Jerrit Coward
Chief Executive Officer
Dixie Electric, LLC and each of its Debtor affiliates

# EXHIBIT A

## DEBTORS' CORPORATE STRUCTURE

# DIXIE ORGANIZATION CHART

